**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0700n.06

**No. 09-6319**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| BILLY JOHNSON, | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF TENNESSEE |
| Defendant-Appellant, | ) | |
| | ) | |

**FILED**

***Oct 05, 2011***

LEONARD GREEN, Clerk

**Before: SUTTON and STRANCH, Circuit Judges; WELLS, District Judge.**[*]

**WELLS, District Judge:** In this murder for hire conviction, Defendant-Appellant Billy

Johnson ("Defendant") challenges the district court's several determinations: (1) denying his motions

for judgment of acquittal and for a new trial; (2) overruling his various evidentiary objections; (3)

denying his requested jury instructions; and, (4) ordering restitution.

For the reasons set forth below, we find the district court did not err in its determinations.

**I. BACKGROUND**

**A.     Procedure**

Martha Johnson was beaten to death in her trailer-home on 22 July 1999. On 23 January

2007, her son Billy Johnson was indicted on murder for hire charges in her death. An eleven-count

---

[*]The Honorable Lesley Wells, United States District Judge for the Northern District of Ohio,
sitting by designation.

Redacted Superseding Indictment was returned on 14 August 2008 in which the Defendant was charged with conspiracy to use interstate commerce facilities in the commission of murder for hire, in violation of 18 U.S.C. § 1958(a) (Count One), with traveling in interstate commerce with the intent to commit murder for hire and aiding and abetting, in violation of 18 U.S.C. §§ 1958(a) & 2 (Count Two), and with use of the mail in the commission of murder for hire, in violation of 18 U.S.C. §§ 1958(a) & 2 (Count Three). The remaining counts of the Superseding Indictment charged the Defendant with false declarations before the grand jury, in violation of 18 U.S.C. § 1623.

Prior to the trial the district court reserved ruling on the government's motions in limine to admit alleged co-conspirator statements under Fed. R. Evid. 801(d)(2)(E) by admitted murderer Danny Winberry, his friend Ricky Elrod, and Mr. Winberry's former girlfriend, Rebecca Haynes Johnson. The district court granted the government's motion to introduce Martha Johnson's prior statements to show a "breakdown of the relationship" between the Defendant and his mother. The Defendant objected to both motions.

Trial in this matter began on 23 April 2009, with the jury returning a verdict of guilty as to all counts. At the close of the government's case-in-chief, the Defendant moved for a judgment of acquittal under Fed. R. Crim. P. 29(a), which the district court reserved until receiving the jury's verdict. Over the Defendant's objection, the district court granted the government's motion to admit into evidence co-conspirator statements of its witnesses and non-witnesses.

The district court sentenced the Defendant on 22 October 2009 to three terms of life in prison as to each of Counts One through Three, with sixty months in prison as to each of Counts Four

through Eleven, all served concurrently. Judgment was entered on 28 October 2009 and the Defendant filed his notice of appeal the following day.

The district court reserved the question of restitution, instructing counsel to submit further briefing regarding the issue. On 14 January 2010, the district court ordered the Defendant to make restitution in the amount of $611,893.56 in a single, lump-sum payment, pursuant to 18 U.S.C. § 3664(f)(3)(A).

**B.      Events**

Prior to her murder on 22 July 1999, Martha Johnson lived alone in a trailer-home in Tipton County, Tennessee. Ms. Johnson owned approximately 520 acres of land, including land in Tipton County she primarily used as a cattle farm. She also owned and operated a local bar named "JJ's." In July 1999, the value of her total assets was listed at $1,162,850, with a net worth of $727,918. Testimony indicated that one of Ms. Johnson's two surviving sons, Billy Johnson, worked on his mother's farm and at her bar.

Testimony during the trial indicated that Ms. Johnson and Billy disagreed over the use and possible development of the acreage belonging to Ms. Johnson. The Defendant sought to develop portions of his mother's acreage into a subdivision, but Ms. Johnson insisted on continuing to farm the land while postponing any extensive development. Billy Archer and Jeremy Lawrence testified to witnessing Ms. Johnson and her son, Billy, engage in heated arguments over the issue. Jerry Craig, a personal friend of Ms. Johnson and fire chief of the City of Covington, Tennessee, testified that in the weeks prior to her death, Ms. Johnson made comments about disinheriting her sons.

According to the testimony of Lee Thomas, a worker on Ms. Johnson's land, the Defendant offered Thomas $10,000 in the fall of 1998 to murder his mother, with a portion up front and the remainder to be paid after completion of the job. The Defendant revisited his offer a month later while the two were, again, working together. Thomas again refused. Tipton County Sheriff's Deputy Ronnie Coleman corroborated Thomas' story, testifying that, a few months prior to the murder of Ms. Johnson, Thomas informed the Sheriff that he had been approached by Billy Johnson and offered a sum of money to kill the Defendant's mother. At the time he told Sheriff Coleman of the Defendant's offer, Thomas was in jail for burglarizing a trailer belonging to Martha Johnson.

According to the testimony of Jeremy Lawrence, a fellow farm worker of Ms. Johnson and a friend of the Defendant, Billy Johnson offered money to Lawrence at one point in 1998 to commit a murder. Mr. Lawrence testified the Defendant showed him a picture of Ms. Johnson to indicate the person whom he sought to have murdered.

According to the testimony of admitted murderer Danny Winberry, the Defendant solicited him at JJ's bar in July 1999 to murder Ms. Johnson. The two agreed on a price of $50,000 for the murder, spoke by telephone over the following two weeks, and then met at a Wal-Mart parking lot in Covington, Tennessee. In the parking lot the Defendant patted down Winberry as a precaution, then gave him $5,000 and a key to his mother's trailer. Winberry understood that he would receive the remaining $45,000 when the Defendant collected on his mother's life insurance policy. According to Winberry, the Defendant called him from a payphone on 19 July 1999, the Monday prior to the murder and instructed him to murder his mother while the Defendant was away on a trip to Hot Springs, Arkansas. Winberry testified Billy Johnson explained his mother would be in

- 4 -

Lauderdale County on both Wednesday and Thursday, and would return to her residence around 5:00 p.m. or 6:00 p.m. The Defendant considered either day suitable for the murder according to Winberry. Telephone records to Winberry's home phone corroborate two pay telephone calls that evening from "Jac's Grocery" located about four minutes' drive from the Defendant's residence. On Tuesday, 20 July 1999, Billy Johnson left for Hot Springs, Arkansas with his family and friends.

The evening before the murder, Winberry asked his then girlfriend, Haynes Johnson, to serve as an alibi for a robbery. She agreed and testified to a conversation in which Winberry asked her, "what if I had to kill somebody? And I said that would be different. And I asked him if he was going to rob somebody, and he said that he didn't have to rob anybody because he had the keys." (Tr. 1151). Haynes Johnson stated that Winberry also showed her a wad of cash that evening which he told her amounted to $5,000.

According to the testimony of farmhand Billy Archer, Ms. Johnson arrived at her residence at approximately 5:15 p.m. on 22 July 1999, where she dropped off Archer and another farm worker who left for home in their own trucks. Archer testified:

> We was on the other side of Fort Pillow cutting hay and her mower had broke down, and we needed to take a piece off of it and go to have it welded. So we quit early and carried it up to Darling's Welding Shop and dropped it off. And then she carried Duke by the grocery store and got some – he got some groceries, and she said, well, I need to get something for lunch tomorrow and everything . . . . So we went to Save A Lot and came to her house, and we got to her house probably I want to say approximately about 5:15 that evening. And she went in the house, and I got in my truck and went to my house.

(Tr. 539-40).

Winberry testified that on the evening of 22 July 2009 he bludgeoned Ms. Johnson to death

with an antique iron he found in the house; he then placed a kerosene lamp on a lit stove to set the trailer on fire once the lamp broke from the heat. Winberry went home to change his clothes and told Haynes Johnson they needed to go out "to be seen." Haynes Johnson testified that Winberry asked her whether a glass kerosene lamp would break and cause a fire if placed on a lit stove. Winberry testified that he returned to the trailer in the early morning hours of 23 July 1999 to find the trailer still intact. Using a lighter and a rag he had obtained from Haynes Johnson, Winberry then applied an accelerant to set a fire in the bedroom of Ms. Johnson's trailer. An autopsy performed on Ms. Johnson revealed that she died from blunt force trauma to the head.

Haynes Johnson testified that when she learned of the murder she confronted Winberry. She testified that Winberry later told her he was involved and some three weeks after the murder explained that Billy Johnson would have no problem killing him because the Defendant hired him to "kill his own mother." (Tr. 1160-63, 1171).

Shortly after learning of Winberry's involvement, Haynes Johnson confided in her friend Peggy Sue Jackson, who also testified at trial. Jackson related that Haynes Johnson confided about the telephone calls Winberry received, his use of her as an alibi, his request for dish rags and lighter fluid on the night of the murder, and her confrontation with Winberry. During the investigation, Haynes Johnson eventually implicated Winberry and Billy Johnson.

Evidence emerged during the trial, in testimony from Lisa and Amanda Barnes, that the Defendant had told Lisa Barnes not to assist Captain John Fletcher of the Tipton County Sheriff's Department in his investigation when she initially reported a suspicious truck parked near Ms. Johnson's trailer the night of the murder.

After his mother's death, Billy Johnson was unable to locate an executed will. Testimony from attorney J. Thomas Caldwell, indicated the Defendant filed the estate intestate, precipitating a situation in which Defendant's brother, Jerry Edwards, and Defendant's seventeen year-old nephew Hunter Edwards, were each entitled to one-third of the estate. Defendant administered the estate and convinced the other two inheritors the estate was worthless. Both inheritors submitted waivers of any claims to the estate. While still a minor, Hunter Edwards signed the waiver without the presence of a guardian.

As a result, Billy Johnson inherited his mother's full estate. He sold several tracts of land to James Burlison, a neighbor. He also received $102,000 in life insurance proceeds, which were mailed to the Defendant from a life insurance company in Florida. At trial, Jonathan Esworthy, a forensic auditor with the Bureau of Alcohol, Tobacco, and Firearms, testified the Defendant obtained a profit of $611,893.56 from the sale of his mother's estate.

## II. ANALYSIS

### A. Motions for Acquittal and for New Trial

#### 1. Standard of Review

This Court reviews *de novo* a denial of a motion for judgment of acquittal. *United States v. McGee*, 529 F.3d 691, 696 (6th Cir. 2008). The applicable standard is whether, viewing the trial testimony and exhibits "in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Solorio*, 337 F.3d 580, 588 (6th Cir. 2003). In so doing, the court does not re-weigh the evidence, re-evaluate the credibility of witnesses, or substitute its

judgment for that of the jury. *United States v. Chavis*, 296 F.3d 450, 455 (6th Cir. 2002). The evidence need not "exclude every reasonable hypothesis except that of guilt." *United States v. Adamo*, 742 F.2d 927, 932 (6th Cir. 1984). "This standard places a 'very heavy burden' upon a defendant making a sufficiency of the evidence challenge." *Chavis*, 296 F.3d at 455 (quoting *United States v. Tocco*, 200 F.3d 401, 424 (6th Cir. 2000)). "[W]e cannot overturn the jury's decision merely because it had to draw reasonable inferences to find [the defendant] guilty." *United States v. Arnold*, 486 F.3d 177, 181 (6th Cir. 2007) (en banc).

This Court reviews a district court's judgment on a Rule 33 motion for a new trial under the abuse of discretion standard. *United States v. Pierce*, 62 F.3d 818, 823 (6th Cir. 1995). An abuse of discretion exists if this Court is firmly convinced that the district court relied on findings of fact that are clearly erroneous, improperly applied the law, or used an erroneous legal standard. *United States v. Munoz*, 605 F.3d 359, 366 (6th Cir. 2010).

### 2. Rule 29 Motion for Acquittal.

For the first time, on appeal, Defendant maintains that he must be acquitted because the testimony of the government's principal witness, Winberry, was "incredible as a matter of law." Billy Johnson maintains that Winberry testified the Defendant told him Ms. Johnson would be at her residence sometime between 5:00 and 6:00 P.M. and, on the day of her murder, she was at her home at 5:15, but only because she left work early when the farm machinery she was using broke down. Accordingly, the Defendant contends that because "predicting the future is impossible" Winberry's testimony is not credible as a matter of law.

Ordinarily, we do not consider issues raised for the first time on appeal. *See United States*

*v. Turnley*, 627 F.3d 1032, 1038 (6th Cir. 2010). Even so, Defendant's reading of testimony given by Winberry and Billy Archer is manifestly unreasonable. Winberry testified the Defendant told him his mother would be baling hay in Lauderdale County and would arrive home between 5 P.M. and 6 P.M. on Wednesday, 21 July 2009, as well as the following day. Billy Archer testified that, while they indeed left work early in Lauderdale County because of the broken machinery, they traveled to a welding shop and a grocery store prior to arriving at Ms. Johnson's residence in Tipton County. A jury could reasonably conclude this journey placed Ms. Johnson at her residence roughly at the time she would have otherwise been home had she worked a full day without any mechanical mishap. The question of credibility is properly left for the jury. Accordingly, the district court's denial of the Defendant's motion for a judgment of acquittal was proper.

### 3. Rule 33 Motion for a New Trial

A motion for a new trial is granted only "in the extraordinary circumstance where the evidence preponderates heavily against the verdict." *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007) (quoted case omitted). Viewing the evidence in a light favorable to the government, a rational jury could have found beyond a reasonable doubt that the government had established the essential elements of the crimes charged. The district court's denial of the Defendant's Rule 33 motion was not an abuse of discretion.

### B. Challenges to Evidentiary Rulings

#### 1. Standard of Review

The Court reviews for abuse of discretion the district court's admission of evidence. *United States v. Davis*, 514 F.3d 596, 611 (6th Cir. 2008). "We have explained that 'the district court's

decision regarding this evidence should remain undisturbed unless [we are] left with the definite and firm conviction that the district court clearly erred in its judgment after weighing the relevant factors, improperly applied the correct law, or inappropriately used the wrong legal standard.'" *Tisdale v. Fed. Express Corp.*, 415 F.3d 516, 535 (6th Cir. 2005). The Court applies the "harmless-error test to evidentiary errors[.]" *United States v. Baker*, 458 F.3d 513, 520 (6th Cir. 2006). "'In determining whether an error is harmless, the reviewing court must take account of what the error meant to [the jury], not singled out and standing alone, but in relation to all else that happened. . . . In other words, we must find that it was more probable than not that the error materially affected the verdict.'" *Id.* at 520 (quoted case omitted).

### 2. Admission of Winberry's statements as co-conspirator.

Defendant contends that statements made by Winberry to Haynes Johnson regarding her demands for "hush money" following the murder, and statements made by Winberry to Ricky Elrod involving the Defendant's failure to pay the remaining $45,000 owed for the murder, were improperly admitted by the district court under Fed. R. Evid. 801(d)(2)(E). Specifically, Defendant maintains Winberry could not be considered a co-conspirator after the murder when the conspiracy to murder ended with the murder itself. Defendant relies upon the decision in *United States v. Silverstein*, 737 F.2d 864 (10th Cir. 1984).

For co-conspirator hearsay statements to be admissible, the government must show by a preponderance of the evidence that: (1) a conspiracy existed, (2) the defendant against whom the hearsay is offered was a member of the conspiracy, and (3) the statements were made during the course and in furtherance of the conspiracy. See Rule 801(d)(2)(E); *Bourjaily v. United States*, 483

U.S. 171, 175 (1987); *United States v. Enright*, 579 F.2d 980, 986-87 (6th Cir. 1978).

In arguing for the exclusion of Winberry's statements to Haynes Johnson and Ricky Elrod, the Defendant misconstrues the parameters of the charge of murder for hire in this case. The objectives of the conspiracy, as argued by the government, did not consist solely of the murder of Martha Johnson, but also, integrally, included the post-murder payment of $45,000 to Winberry from the Defendant garnered from Ms. Johnson's life insurance proceeds. The duration of the murder for hire conspiracy, so construed, spanned from July 1999 until payment was made to Winberry. As Winberry noted at trial, he never received that balance of payment. Further, Winberry's statements to Haynes Johnson and Ricky Elrod nurtured the conspiracy by concealing it from the investigation of law enforcement.

Statements made by Winberry to Rebecca Haynes Johnson and Ricky Elrod were properly admitted as statements made by the Defendant Billy Johnson's co-conspirator during and in furtherance of the conspiracy to commit murder for hire.

### 3. Admission of Prior Consistent Statements involving Haynes Johnson.

The Defendant maintains the district court erred in allowing the introduction of prior statements by Winberry to Haynes Johnson, and by Haynes Johnson to her friend Peggy Sue Jackson. See Rule 801(d)(1)(B). The Sixth Circuit permits the admission of prior consistent statements through a third party, not just the declarant, so long as the testimony and circumstances in court comply with Fed. R. Evid. 801(d)(1)(B). As such, to admit prior consistent statements requires: (1) both the initial witness and the corroborating witness testify and are subject to cross-examination; (2) the opposing party must at least imply recent fabrication or improper influence or motive by the

initial witness; (3) the proponent must offer a prior consistent statement that is consistent with the initial witness' challenged in-court testimony; and, (4) the initial witness' prior consistent statement must have occurred prior to the time he or she had motive to fabricate. *See United States v. Trujillo*, 376 F.3d 593, 611 (6th Cir. 2004); *United States v. Hebeka*, 25 F.3d 287, 292 (6th Cir. 1994).

In view of the evidence, the requirements of Rule 801(d)(1)(B) have been satisfied. First, Winberry, Haynes Johnson, and Peggy Sue Jackson testified and were subject to cross-examination. Second, defense counsel implied that Winberry's testimony was recently fabricated to avoid the death penalty and secure a reduced sentence. As well, defense counsel suggested that Haynes Johnson's testimony was fabricated to avoid being prosecuted as an accessory to murder. Third, Haynes Johnson's testimony about Winberry's statements at the time of the murder were consistent with Winberry's testimony. In addition, Peggy Sue Jackson's testimony regarding statements made to her by Haynes Johnson following the murder were consistent with Haynes Johnson's testimony. And, fourth, the statements made by Winberry regarding the murder were made prior to the time he was even approached by authorities.

Defendant's allegation during trial that Danny Winberry and Rebecca Haynes Johnson had recently fabricated their testimony to reduce or avoid further legal consequences allowed the government to rehabilitate Winberry through testimony from Haynes Johnson about prior consistent statements, and to rehabilitate Haynes Johnson through testimony from Peggy Sue Jackson about prior consistent statements. The district court's determination was proper under Rule 801(d)(1)(B).

**4. Admission of Prior Consistent Statements involving Ronnie Coleman.**

Defendant contends the district court erred in allowing the admission of testimony by Ronnie

- 12 -

Coleman concerning a conversation he had with Lee Thomas, one of Martha Johnson's farm hands. In this conversation with Coleman, then a Tipton County Sheriff's Deputy, Thomas related being solicited by the Defendant to murder Martha Johnson for a sum of money. The conversation between Coleman and Thomas occurred prior to the murder of Martha Johnson.

The Defendant, first, maintains that Coleman's testimony regarding this conversation should have been excluded, as Thomas was under arrest at the time and "had a motive to curry favor" with Deputy Coleman. The Court permitted Coleman's statement under Fed. R. Evid. 801(d)(1)(B), as a prior statement consistent with Thomas' testimony offered to rebut a charge of improper motive.

The admission was proper. The Defendant had the declarant, Thomas, in court, subjected him to cross-examination, and raised the issue of the propriety of his statement regarding being solicited by the Defendant to murder Ms. Johnson. Mr. Thomas was available to be cross-examined again by defense counsel following Coleman's testimony. The record provides no indication of a motive for Coleman to fabricate the testimony.

Even if the Court considered Coleman's testimony regarding this conversation as hearsay because Thomas' prior consistent statement was not made prior to the time that an alleged improper motive arose, the error of admission is harmless and does not warrant reversal. In order to merit a reversal, such an error must be shown not to have been harmless, i.e., that it was "more probable than not that the error materially affected the verdict." *United States v. Hernandez*, 227 F.3d 686, 696 (6th Cir. 2000). The introduction of significant admissible testimony from Lawrence and Winberry, confirming the Defendant's efforts to solicit another person to murder his mother, rendered harmless any putative error in allowing the admission of Coleman's corroborative testimony.

The Defendant, further, contends that Coleman's testimony should be stricken for "lack of personal knowledge" because he relied upon notes for his testimony. A review of the transcript indicates that Coleman admitted to accessing notes in only one instance, when recalling the date of his interview of Thomas. Otherwise, Coleman confirmed he had independent knowledge of the material contained in the notes.

That a witness cannot recall a specific date does not require exclusion of that testimony. Fed. R. Evid. 602 requires witnesses to testify only to matters about which they have personal knowledge. The foundation laid for Coleman's testimony satisfied Rule 602 where it established Coleman's conversation with Thomas and the circumstances surrounding that conversation. Under those circumstances, the lack of recall as to the specific date of the conversation does not alter the evidence that Coleman had personal knowledge of the matter.

### 5. Admission of Statements made by Martha Johnson.

The Defendant contends the district court erred in admitting "inadmissible hearsay" testimony by Archer, Craig, and Lawrence. Each testified to witnessing remarks made by Martha Johnson to, or about, the Defendant. These remarks focused exclusively upon the disagreements between the Defendant and his mother over the development of her real property. Fed. R. Evid. 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered to prove the truth of the matter asserted."

A review of the evidence indicates the government introduced the testimony not to prove the truth of the matter asserted, but instead, to indicate a breakdown in the relationship between mother and son. In instances such as this, the Sixth Circuit recognizes that:

"when a statement is offered to prove neither the truth nor falsity, there is no need to assess the credibility of the declarant. The significance lies entirely in the fact that the words were spoken. Thus, the statement does not fall within the Rule 801(c) definition of hearsay nor would the purposes of the hearsay rule be served by treating it as hearsay."

*United States v. Dandy*, 998 F.2d 1344, 1351 (6ᵗʰ Cir. 1993) (quoting *United States v. Hathaway*, 798 F.2d 902, 905 (6th Cir. 1986)). As such, admission of the testimony is proper regarding the arguments between Billy Johnson and his mother, admitted not for the truth of what was said, but for the significance of the verbal exchange itself.[1]

### 6. Admission of Evidence on the Administration of the Victim's Estate.

The Defendant challenges the admission of testimony by Thomas Caldwell and Hunter Edwards under Fed. R. Evid. 404(b). In pertinent part, Rule 404(b) provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive." Thomas Caldwell served as the attorney for Martha Johnson's estate. Defendant's nephew, Hunter Edwards, stood to inherit one third of the estate through intestacy. Both testified to the Defendant's disposition of the estate after the murder. The Defendant maintains the Court

---

[1]The district court also could have reasonably admitted the testimony of the witnesses to Martha Johnson's statements under the "state of mind" exception to the hearsay rule. The state of mind exception to the hearsay rule provides: "A statement of the declarant's then existing state of mind . . . (such as intent, plan [or] motive)" is not excluded by the hearsay rule. Fed. R. Evid. 803(3). The district court did not abuse its discretion in admitting these statements as admissible under the state-of-mind exception to the hearsay rule. In a prosecution based upon murder for hire, the state of mind of the victim is highly relevant as it relates to the accused. *United States v. Tokars*, 95 F.3d 1520, 1535 (11th Cir. 1996).

- 15 -

improperly admitted their testimony as it involved Billy Johnson's conduct after the murder occurred.

The government contends the testimony was admissible under Rule 404(b) to illuminate Billy Johnson's motive. Count One of the Superseding Indictment specifically alleged the duration of the conspiracy to commit murder for hire extended from July 1999 and continued to the date of the Indictment, 14 August 2008. That conspiracy continued during the Defendant's consolidation of Martha Johnson's estate. For instance, Hunter Edwards testified that, as a minor and without the assistance of a guardian, he was induced by the Defendant to waive his right to one-third of Martha Johnson's estate by the false representation that her estate was worthless. The government maintains the Defendant's reason for conspiring with Winberry in a murder for hire scheme centered on the desire to obtain sole control of his mother's estate.

A review of the record indicates Caldwell's testimony concerning the administration of the estate by the Defendant, and Edwards' testimony regarding the submission of his disclaimer of interest in the estate, were probative of the question of Billy Johnson's motivation.

Defendant's further argument, that the district court erred by not making a finding that the testimony was more probative than prejudicial as required in Rule 404(b), is of no avail. Where, as here, a Defendant does not request an on-the-record balancing, then the court's failure to make an express finding on this issue does not require reversal. *See United States v. Acosta-Cazares*, 878 F.2d 945, 950 (6th Cir. 1989), *abrogated on other grounds*, *Rattigan v. United States*, 151 F.3d 551, 556 n.2 (6th Cir. 1998).

The testimony of Caldwell and Edwards was properly admissible as probative of the Defendant's motive.

### 7. Exclusion of Lisa Uttz' Testimony

Prior to trial, the district court granted the government's motion in limine to exclude testimony regarding a burglary of the home of Lisa Uttz, carried out by Winberry four months before the murder of Martha Johnson. The Defendant asserts the district court's determination to exclude the evidence was error, and claims the Uttz testimony is "reverse 404(b)" evidence that should have been permitted to indicate that Winberry's murder of Martha Johnson was actually a "burglary gone bad" rather than part of a murder for hire scheme.

The district court denied Defendant's request to permit Uttz' testimony, considering it impeachment evidence that did not comply with Fed. R. Evid. 608(b).[2] Rule 608(b) provides that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness . . . may not be proved by extrinsic evidence." Uttz's testimony of the burglary consisted of extrinsic evidence of matters collateral to the charges against the Defendant rendering it inadmissible under Rule 608(b). Even if considered under Rule 404(b), the Uttz testimony amounts to an improper effort to introduce evidence of a prior act to show criminal

---

[2]The district court did, however, allow Uttz to testify regarding the burglary of her home outside the presence of the jury. In addition, while testifying at trial, Winberry did not deny his involvement in the Uttz burglary and defense counsel cross-examined Winberry at length regarding the burglary.

disposition or propensity. *See United States v. Lucas*, 357 F.3d 599, 605 (6th Cir. 2004); *United States v. Williams*, 458 F.3d 312, 317-18 (3rd Cir. 2006).

The district court's determination to exclude the Uttz testimony as prohibited under Rule 608(b) was not an abuse of discretion.

**C. Jury Instructions**

**1. Standard of Review**

"This court reviews a district court's refusal to give requested jury instructions under an abuse of discretion standard." *King v. Ford Motor Co.*, 209 F.3d 886, 897 (6th Cir. 2000). A refusal to give a requested instruction is an abuse of discretion requiring reversal if the instruction is "(1) a correct statement of the law, (2) not substantially covered by the charge actually delivered to the jury, and (3) concerns a point so important in the trial that the failure to give it substantially impairs the defendant's defense." *United States v. Franklin*, 415 F.3d 537, 553 (6th Cir. 2005)(quoted case omitted).

**2. Jury Instructions on the Facilitation of Murder for Hire**

The Defendant challenges the district court's refusal to allow proffered jury instructions to Count Two and Count Three of the Superseding Indictment. In Count Two, the Defendant was charged with traveling in interstate commerce with the intent to commit murder for hire and aiding and abetting, in violation of 18 U.S.C. § 1958(a). In Count Three, the Defendant was charged with the use of the mail in the commission of murder for hire, in violation of 18 U.S.C. § 1958(a).[3] In

---

[3]While also captioned in his Brief as a challenge to Count One of the Superseding Indictment, the Defendant does not address an argument to Count One on appeal.

neither instance did the district court commit an abuse of discretion in rejecting the Defendant's jury instructions. The instructions offered were not correct as a matter of law.

As to Count Two, the Defendant maintains that the "evidence was insufficient to prove murder for hire" because the "trip to Arkansas charged in Count 2 did nothing to 'facilitate' or 'further' – that is, make 'easier' – the murder itself." Def. Br. 48, R. 165 p. 4. The Defendant misconstrues the instruction as one involving a charge of murder. Section 1958(a) specifically addresses murder for hire involving travel in interstate commerce, the use of the mail, or any facility in interstate commerce. The Defendant's travel from Tennessee to Arkansas involved the use of interstate commerce. This Court has previously held that use of interstate commerce "need not be an essential element of the scheme but need only facilitate or further the unlawful activity." *United States v. Weathers*, 169 F.3d 336, 343 (6th Cir. 1999)(quoted case omitted).

The jury reasonably found the record supported the existence of a sufficient nexus between the Defendant's travel to Arkansas and the facilitation of the murder for hire conspiracy. The record establishes the Defendant waited to schedule the murder, and then specifically arranged to have Winberry murder his mother during the time the Defendant and his family were in Arkansas, providing the Defendant with an alibi. The Defendant's travel to Arkansas served to facilitate and further his planning of the murder for hire scheme.

As to Count Three, involving the use of the mail to facilitate the commission of the murder for hire, the district court denied the Defendant's request for the following instruction:

> [I]f the mailing in this case by American Bankers Insurance Company, as alleged in
> Count Three, to pay the proceeds of an insurance policy to the defendant occurred

> *after* the murder of Martha Johnson, then the government has not proven that the mails were used to facilitate or further her murder.

(R. 165, emphasis in original). The Defendant continues to maintain on appeal that the planned murder for hire must take place subsequent to the use of the mails and, because the murder in this instance occurred prior to the Defendant's receipt of Ms. Johnson's insurance proceeds, the jury lacked the necessary evidence to find guilt as to Count Three of the Superseding Indictment.

Defendant misconstrues the charge. Section 1958(a) is a jurisdictional statute allowing federal prosecutors to bring specific types of state murder cases into federal court. *See United States v. Winters*, 33 F.3d 720, 721 (6th Cir. 1994). There is no requirement in the statute that use of the mail in the facilitation of the criminal enterprise take place prior to the murder. Instead, the statute simply involves the use of interstate activities, such as mail, that enable murder for hire schemes. The evidence must establish a nexus between the use of the mail and the furtherance of the murder for hire strategy. In this instance, the jury reasonably found convincing the evidence that the Defendant, with little financial means of his own, required Ms. Johnson's life insurance checks to satisfy the $45,000 obligation he retained with Winberry, a central obligation in the murder for hire conspiracy. The insurance proceeds arrived in the mail during the pendency of the murder for hire conspiracy.

The district court did not abuse its discretion in refusing to give the Defendant's requested jury instructions to Counts Two and Three of the Superseding Indictment.

### D. Payment of Restitution

#### 1. Standard of Review

An appellate court will "review de novo the question of whether restitution is permitted under the law, and review the amount of a restitution award for abuse of discretion." *United States v. Boring*, 557 F.3d 707, 713 (6th Cir. 2009).

#### 2. Restitution to Martha Johnson's Estate

The Defendant objects to the district court's order of restitution, maintaining that the murder for hire scheme for which the Defendant was convicted did not cause damage to, or loss of, Martha Johnson's property. In his appeal, Defendant continues to treat the convicted offense as a murder rather than as an ongoing conspiracy to commit murder for hire.

The district court sentenced the Defendant under the Mandatory Victims Restitution Act of 1996 ("MVRA"), 18 U.S.C. §§ 3663A-3664. According to the MVRA, "restitution is mandatory – regardless of a defendant's financial situation – when a defendant is convicted of a crime of violence, an offense against property, or an offense related to tampering with consumer products." *United States v. Vandeberg*, 201 F.3d 805, 812 (6th Cir. 2000); *see also* 18 U.S.C. § 3664(f)(1)(A) (explaining that a court shall order restitution in full without consideration of defendant's financial circumstances).

The MVRA requires restitution to the "victim" or, if the victim is deceased, the victim's estate. The statute clearly contemplates Martha Johnson as a victim. Section 3663A(a)(2) of the MVRA defines the term "victim" to mean "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an

offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern."

Restitution to the victim's estate, pursuant to the MVRA, is clearly permitted in this instance. Accordingly, the district court did not err in ordering restitution.

In considering the amount of restitution, the district court calculated the total proceeds obtained by the Defendant from his sales of portions of Martha Johnson's estate following her death, and subtracted the total amount of Ms. Johnson's debt at the time of her death. The amount of restitution ordered, $611,893.56, reflected the proceeds received by the Defendant from the sale of assets he inherited due to the death of Martha Johnson, calculated as $780,671.61, less the loan payoff amounts and real estate taxes. The district court noted in its restitution order that the Defendant did not make "any specific objections to challenge the amount sought by the United States on behalf of the estate." R.155 p. 6, Order of Restitution.

The district court's method for calculating restitution was entirely consistent with the purpose of the MVRA to "restore a victim [or her estate], to the extent money can do so, to the position [she] occupied before sustaining injury." *United States v. Boccagna*, 450 F.3d 107, 115 (2nd Cir. 2006). Accordingly, the district court did not abuse its discretion in ordering Defendant to pay restitution of $611,893.56 to the estate of Martha Johnson.

### III. CONCLUSION

For the reasons discussed above the district court neither erred nor abused its discretion in denying the Defendant's insufficiency claims, or his challenges to the district court's rulings on

matters of admissible evidence, requested jury instructions, or the determination and amount of

restitution. Accordingly, we AFFIRM the district court's determinations.