# IN THE SUPREME COURT OF THE STATE OF DELAWARE

CHRISTOPHER RIVERS, §
§ No. 536, 2016
Defendant Below, §
Appellant, § Court Below: Superior Court
§ of the State of Delaware
v. §
§ ID. No. 1409001584 (N)
STATE OF DELAWARE, §
§
Plaintiff Below, §
Appellee. §

Submitted: January 10, 2018
Decided: March 20, 2018

Before **VAUGHN**, **SEITZ**, and **TRAYNOR**, Justices.

Upon appeal from the Superior Court. **AFFIRMED**.

John A. Barber, Esquire, (*Argued*), Wilmington, Delaware and Brain J. Chapman, Esquire, Newark, Delaware, for Appellant.

Maria T. Knoll, Esquire, (*Argued*), Wilmington, Delaware, for Appellee.

**VAUGHN**, Justice:

The Appellant, Christopher Rivers, was convicted at a jury trial of two counts of Murder in the First Degree, two Counts of Possession of a Firearm During the Commission of a Felony, Conspiracy in the First Degree, and Criminal Solicitation in the First Degree. He sets forth two claims on appeal. First, he claims that the trial court's denial of his motion for a change of venue from New Castle County to either Kent or Sussex County prevented him from receiving a fair and impartial jury trial because of highly inflammatory and sensationalized media coverage and the New Castle County public's reaction to it. Second, he claims the trial court abused its discretion by admitting into evidence co-defendants' statements made after the murders were committed pursuant to the co-conspirator hearsay exception under Delaware Rule of Evidence 801(d)(2)(E). We find no merit to either claim and affirm.

## FACTS AND PROCEDURAL HISTORY

At approximately 1:28 a.m. on September 22, 2013, New Castle County police officers responded to a reported shooting at 84 Paladin Drive, Wilmington, Delaware. They found that Joseph Connell and his wife, Olga, who had only recently been married, had been shot and killed in the front yard of their house. After an extensive investigation, the police arrested Rivers on September 3, 2014 and charged him with the murders.

Rivers and Joseph Connell had been business partners in C&S Automotive Repair. Through their investigation, the police determined that Rivers' motive was to obtain the benefit of life insurance proceeds on Joseph Connell's life. In October, 2012, Rivers and Connell obtained a mortgage from Susquehanna Bank in connection with their business. The mortgage amount was a little less than $1,000,000. As part of the transaction, they were required to purchase life insurance on both of their lives in the amount of $977,500 each to pay off the mortgage if one of them were to die. The death of both Connells would result in Rivers owning the business free and clear of the Susquehanna mortgage.

The police investigation revealed that Rivers had agreed to pay Joshua Bey $60,000 in exchange for Bey arranging to have the murders carried out. Bey, in turn, agreed with Dominque Benson and Aaron Thompson that Benson and Thompson would commit the murders.

The $60,000 was not paid prior to the murders. Rivers gave Bey a $5,000 down payment. After the murders, Rivers gave another $5,000 to Bey, which Bey gave to Thompson. Later Rivers gave $2,500 to Bey which Bey gave to Benson. Later he gave $1,500 to Bey, which Bey also gave to Benson.

The murders generated media coverage. In his opening brief, Rivers has included a list of 49 television, radio, print or internet items of media coverage. He claims that the media coverage was highly inflammatory and sensationalized.

Articles following Rivers' arrest discuss the possible murder-for-hire scheme in which Rivers was alleged to have engaged a middle man to hire one or more people to kill the Connells. The murders became known as the Paladin Club killings. After a proof positive hearing in December 2014, The News Journal published an article on the murders which reported details of the investigation based on the lead investigator's testimony at the hearing.

Prior to trial, Rivers' counsel hired Susquehanna Polling and Research to conduct a poll concerning public awareness of the case. A survey was taken of 1050 residents in Delaware, 350 from each county. In New Castle County 39% of those polled said they had read or heard about the case. In Kent and Sussex Counties, 17% in each county said that they had read or heard about the case. Of the 39% in New Castle County who said they had read or heard of the case, 88% said they thought Rivers was either "definitely" or "probably" guilty. The corresponding percentages of those saying they thought Rivers was definitely or probably guilty were 95% in Kent County and 98% in Sussex County. Of the people in New Castle County who said they thought that Rivers was definitely or probably guilty, 45% said they were either "somewhat unlikely" or "very unlikely" to change their minds if they were selected as a juror. The corresponding percentages in Kent County and Sussex County were 86% and 78 % respectively.

Prior to trial, Rivers' moved for a change of venue from New Castle County. The trial judge denied Rivers' motion without prejudice, leaving Rivers free to renew the motion if *voir dire* proved unsuccessful in securing a fair and impartial jury.

## DISCUSSION

Under Superior Court Criminal Rule 21, the Superior Court shall transfer a criminal proceeding to another county "if the court is satisfied that there exists in the county where the prosecution is pending a reasonable probability of so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial in that county." "The fact that a criminal case generates publicity does not, without more, require a change of venue to preserve a defendant's right to a fair trial."[1] "[A] defendant must present 'highly inflammatory or sensationalized pre-trial publicity' that on its face is 'sufficient for the court to *presume* prejudice.' "[2]

We review the Superior Court's denial of a motion to transfer venue under an abuse of discretion standard.[3]

The Superior Court carefully considered Rivers' motion for a change of venue. It reviewed the media accounts covering the case, and found that the media

---

[1] *Powell v. State*, 49 A.3d 1090, 1097 (Del. 2012).
[2] *Id.* (quoting *Riley v. State*, 496 A.2d 997, 1014 (Del. 1985)).
[3] *Sykes v. State*, 953 A.2d 261, 272 (Del. 2008) (citing *Riley*, 496 A.2d at 1015).

coverage in this case was "not so highly inflammatory or sensationalized" that a change of venue was warranted. It further found that:

> The reports are informational in scope and many repeat the same story: a young, newlywed couple was killed outside their apartment building and the victim's business partner allegedly arranged for their murder. Though the facts might be unsettling, they are not reported in an inflammatory manner.
>
> Moreover, the potential jurors in New Castle, Kent, and Sussex Counties have been equally exposed to the media coverage in this case. Defendant provided a sampling of more than 40 news reports and videos since September 2013. Many of those articles were published by The News Journal, which is distributed statewide. Thus, it is "unrealistic to think a jury pool that is significantly ignorant of the allegations involved in this case could be found in Kent or [Sussex] County."[4]

The court further reasoned that the poll results did not weigh in favor of a change of venue.

The trial court's findings and conclusions are supported by the record. Ultimately, the court was successful in empaneling a jury of New Castle County residents to decide the case. The Superior Court's denial of the motion for change of venue was not an abuse of discretion.[5]

---

[4] *State v. Rivers*, Del. Super., I.D. No. 1409001584, Butler, J. (Dec. 22, 2015) (ORDER) (citation omitted).

[5] On appeal, Rivers also argues that the trial court's *voir dire* was insufficient to discover potential juror prejudice arising from the pre-trial publicity. At trial, Rivers and the State each submitted proposed *voir dire* questions. The court considered the proposals and then prepared the *voir dire* questions that it decided it would give. It did not include four questions proposed by Rivers that explored whether jurors had heard or read about the case and whether they had formed opinions about the case. After the court informed the parties of the *voir dire* questions it had decided upon, Rivers did not object. If a party submits proposed *voir dire*, and a proposed question or questions

Rivers next argues the Superior Court abused its discretion when it admitted into evidence statements made by co-conspirators after the murder of the Connells.

Bey testified that efforts were made to collect payment for the Connell murders' after their commission. Bey said Rivers told him the police had seized $25,000 from him following the murders, money which Rivers had planned to pay Bey. Rivers did subsequently make payments of $5,000, $2,500, and $1,500 after the murders. After receiving the $5,000 payment, Bey met with Benson. Benson called Thompson and informed him of the amount of the payment. Thompson responded "Don't accept it. Don't take it." Thompson thereafter met with Bey and stated that Rivers had "been playing us the whole time" and "[Rivers] never had no money from the jump." Thompson told Bey "You better tell [Rivers], like, he better get that money together or it's gonna get serious." Bey responded by telling Rivers "that people not playing, they want their money and you gotta figure something out cuz they not playing no games, they want their money."

We review a trial court's decision on the admissibility of evidence under an abuse of discretion standard.[6]

---

are not included in the *voir dire* which the court decides upon, the party should not assume that the issue is preserved if the party makes no objection after being informed of the *voir dire* the court has decided upon. In this case, however, we are satisfied that the court's *voir dire* was more than adequate to ferret out any prejudice to Rivers from pre-trial publicity.

[6] *Forrest v. State*, 721 A.2d 1271, 1275 (Del. 1999).

The Delaware Rules of Evidence provide a "statement is not hearsay if . . . the statement is offered against a party and is . . . a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy."[7] Rivers contends that the conspiracy ended when the murders were committed. Statements made about payment after the murders occurred, he contends, are therefore not made during the course and in furtherance of the conspiracy.

Prior to trial, the Superior Court granted the State's *motion in limine* to allow Bey to testify concerning the statements regarding payment made by the co-conspirators after the murders. The trial judge reasoned that the primary objective of River's co-defendants in the murder-for-hire conspiracy was to be paid for the commission of the murders. The trial court further reasoned that the statements made by the co-defendants concerning payment after the murders were completed were in furtherance of the conspiracy and admissible under the co-conspirator statement exception to the hearsay rule.

"Generally, a conspiracy terminates upon accomplishment of the principal objective unless evidence is introduced indicating that the scope of the original agreement included acts taken to conceal the criminal activity."[8] While we have not, it would appear, previously ruled on the admissibility of co-conspirator statements

---

[7] D.R.E. 801(d)(2)(E).
[8] *Reyes v. State*, 819 A.2d 305, 312 (Del. 2003).

in a murder-for-hire case, we have ruled on co-conspirator statements that took place after other crimes have been committed. For example, this Court has stated that "statements made after [a] robbery but before the proceeds were divided are made 'in furtherance of the conspiracy.' "[9]

The Superior Court ruled that in a murder-for-hire case, the conspiracy ends when the persons hired to commit the murders are paid. We agree with that conclusion. For Bey, Benson, and Thompson, the principal objective for entering into the conspiracy was payment for their criminal acts. Payment for committing the substantive crimes was part of the conspiracy. It follows that statements made by the co-conspirators after the murder regarding payment were made during the course and in furtherance of the conspiracy. The result we reach is in accord with authorities in other jurisdictions.[10]

---

[9] *Jones v. State*, 940 A.2d 1, 11 (Del. 2007) (citations omitted).

[10] *See U.S. v. Johnson*, 443 F. App'x 85, 92–93 (6th Cir. 2011) (statements regarding "hush money" and the failure to pay for a murder were made during and in furtherance of the conspiracy); *State v. Cruz*, 672 P.2d 470, 477 (Ariz. 1983) ("[T]he object of the conspiracy includes more than the commission of a substantive offense. In such cases the conspiracy may continue after the commission of the substantive offense.") (citations omitted); *State v. Jones*, 873 P.2d 122, 130 (Idaho 1994) (finding the murder-for-hire "conspiracy was not complete until final payment was made, and all statements made . . . until final payment are admissible.").

Rivers also argues that the statements were unduly prejudicial, but we find that the probative value of the statements was not substantially outweighed by the danger of unfair prejudice.[11]

For the foregoing reasons, the judgment of the Superior Court is affirmed.

---

[11] Rivers also argues that admitting co-conspirators statements regarding payment made after the substantive crime is committed will allow a conspiracy to go on in perpetuity if payment is never completed. We do not see that as an issue in this case.