IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| FRANK TORRES, | § | |
| | § | No. 1, 2024 |
| Defendant Below, | § | |
| Appellant, | § | Court Below—Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. Id. Nos: 2108011736 (N) |
| STATE OF DELAWARE, | § | 2108011803 (N) |
| | § | 2108011799A (N) |
| Appellee. | § | |

Submitted: September 18, 2024
Decided: October 22, 2024

Before **SEITZ**, Chief Justice; **VALIHURA** and **TRAYNOR**, Justices.

## **ORDER**

This 22nd day of October, 2024, after consideration of the parties' briefs and the record on appeal, it appears to the Court that:

(1)     Frank Torres seeks review of his convictions on charges of robbery in the first degree, attempted robbery, two counts of possession of a deadly weapon during the commission of a felony ("PDWDCF"), two counts of wearing a disguise during the commission of a felony, and misdemeanor traffic violations.  Torres was sentenced to 12 years unsuspended Level V supervision followed by probation.  Torres claims that the Superior Court abused its discretion and violated his right to a fair trial by allowing a police officer to offer lay-opinion identification testimony under Delaware Uniform Rule of Evidence ("D.R.E.") 701.  We conclude that the

trial court correctly applied our decisions relating to lay-opinion identification testimony by law enforcement under D.R.E. 701 and affirm.

(2)     On August 21, 2021, just before 10:30 p.m., Gregory McKay—a Wawa convenience store supervisor—was getting something from his car when one of his associates reported via radio that a cigarette theft had just occurred inside the store. McKay saw the suspect—whom he described as a "Hispanic dude" in his early twenties and wearing a white t-shirt—leaving the store in a Nissan car with "at least 7 or 8" cartons of Newport cigarettes.[1] McKay took down the Nissan's license plate number and provided it to the 911 operator when he reported the theft. Though McKay did not witness the suspect steal the cigarettes, he confirmed that they were missing from inventory.

(3)     Trooper Mark DiMaio responded to McKay's 911 call. He took McKay's statement and reviewed surveillance video of the scene, obtaining still photos of the suspect and the license plate number of the car. The still photos showed the suspect in a black hat with orange coloring, a white t-shirt, and tan pants. The car was a "darker model blue" Nissan Altima.[2] DiMiao distributed copies of the photos to other officers on duty, urging them to "be on the lookout" for the suspect.[3]

---

[1] App. to Opening Br. at A104–05, A108, A110–13.
[2] *Id.* at A127.
[3] *Id.* at A125.

(4)     That same night, Kerry Viera was working the night shift at a 7-Eleven store on Route 40 and Porter Road.  A person wearing a white t-shirt as a mask and a hat that covered all but the eyes entered the store and began demanding money while threatening Viera with a folding knife.  Realizing that it was a robbery, Viera took a metal cleaning stick for the grill and banged it on the counter to scare the individual off.  Viera refused to comply with the demand to hand over money.  The individual "started . . . shoving stuff all over the place" and "throwing stuff" at Viera.[4]  Amidst the "madness[,]" Viera called 911.[5]  The perpetrator left the store.

(5)     Corporal William Drummond was dispatched to the 7-Eleven.  He reviewed the surveillance video from the incident and compared it to a still shot of the Wawa footage he had received from Trooper DiMaio.  Having interacted with Torres before, Corporal Drummond recognized him in the image from the Wawa incident.  Drummond made him a suspect in the 7-Eleven case because of the identical clothing and stature of the individual in the 7-Eleven footage.  The footage also showed a "blue-ish gray-ish color Nissan Altima."[6]

(6)     Also in the early morning hours of August 22, David Mize was working at a Shell gas station on Christiana Road a few miles from the 7-Eleven.  He was conducting a "cash drop," when an individual entered the store, threatened him with

---

[4] *Id.* at A138, A142.
[5] *Id.* at A142.
[6] *Id.* at A216.

3

a knife, and demanded that he give him the money.[7] Another individual then entered the store with a gun, apparently to assist in stopping the robbery. The individual with the knife dropped the money and left. Mize then called 911.

(7) Corporal Michael Cahall responded to Mize's 911 call. After taking a statement from Mize, he disseminated a description of the suspect: "a[n] early twenties white male wearing a face mask covering with a baseball hat, white shirt, tan pants, and sneakers."[8] Detective Bridgette Harris took over this investigation from Cahall. After reviewing the Shell surveillance video, she concluded that the suspect's appearance and vehicle were consistent with the description of the suspect in the Wawa and 7-Eleven incidents. Drummond heard the description of the Shell suspect via police radio and provided Torres's name to Harris.

(8) Officers could not find Torres at any of his "normal whereabouts," so Harris placed a "stop code" on the Nissan Altima seen in the surveillance footage at each location.[9] A stop code alerts officers that a vehicle is part of an investigation. While on patrol later that day, Officer Gavin Biddle attempted to stop the Nissan Altima identified in the stop code. The car sped away at over 80 miles per hour on roads with speed limits of 25 and 35 miles per hour before joining a highway. After

---

[7] *Id.* at A271, A272–73. A "cash drop" is the process of moving large amounts of money—usually more than $200—from the register into a drop safe to protect the money.
[8] *Id.* at A312.
[9] *Id.* at A336–37.

4

a pursuit of at least five miles, Biddle stopped the Nissan Altima on Interstate 295. Torres was the driver, and Biddle arrested him at the scene. Police later searched the vehicle. They found 37 packs of Newport cigarettes, a black hat with a red and orange picture on the front, and a white t-shirt.

(9) A grand jury indicted Torres on August 29, 2022. The Superior Court held a three-day jury trial beginning August 14, 2023.

(10) After jury selection on August 8, 2023, the State informed the trial court that it intended to call Corporal Drummond and ask him whether he recognized Torres as the suspect in the still images from the Wawa surveillance footage. The State planned to use this lay-opinion identification testimony for two purposes: to explain to the jury why the investigation "transpired the way it [did]" and immediately focused on Torres and to explain that Drummond's identification of Torres obviated the need for DNA or fingerprint evidence. [10] Torres objected. He argued that identification was a matter for the jury, and that it was "not appropriate for an officer who may have never met Mr. Torres before to say he immediately recognized [the individual in the Wawa surveillance footage] as Mr. Torres."[11]

(11) On the first day of trial, the court held a hearing outside the presence of the jury to consider foundation testimony supporting the admission of Drummond's

---

[10] *Id.* at A62–64.
[11] *Id.* at A75.

identification testimony. At the hearing, Drummond testified that he had interacted with Torres "around a dozen or so times" before the night of the Wawa theft.[12] Drummond also agreed that these interactions with Torres were "pretty extensive."[13] He testified that he had seen Torres multiple times when responding to complaints at a hotel where Torres's mother used to live and interacted with him for "a couple hours" when Torres had been arrested as a suspect in another crime.[14] Drummond further testified that when he saw the image from the Wawa incident distributed by DeMaio, he "almost immediately" recognized Torres.[15] After identifying Torres in the courtroom, Drummond testified that Torres had "slimmed down quite a bit" since their prior interactions.[16]

(12) Following argument and a review of caselaw by the trial judge, the trial judge stated that "[t]he Court has read *Biddle*, *Saavedra*, and *Thomas*, and notes the Supreme Court's cautions regarding this type of testimony."[17] The trial judge concluded:

> I do believe . . . that there's been a proper foundation laid as to the special familiarity with Mr. Torres at the time of these offenses and from interactions before then. I do consider his appearance as it has changed from that time to now just two years ago. And both given

---

[12] *Id.* at A162.
[13] *Id.*
[14] *Id.* at A163.
[15] *Id.* at A166.
[16] *Id.* at A161.
[17] *Id.* at A182. *See Biddle v. State*, 302 A.3d 955, 2023 WL 4876018 (Del. July 31, 2023) (TABLE); *Saavedra v. State*, 225 A.3d 364 (Del. 2020); *Thomas v. State*, 207 A.3d 1124, 2019 WL 1380051 (Del. Mar. 26, 2019) (TABLE).

some of that change but also just looking at the video itself, I do find that it's neither abundantly clear who that is depicted there, nor is it of such poor quality, so hopelessly obscure[,] that this person is just guessing. Instead, it's much more consistent with, as I said, someone who has special familiarity being able to say that that is Frank Torres from interactions; I have a strong belief that is Frank Torres, or I can do so as opposed to somebody who is wholly unfamiliar and simply trying to compare that video and that picture with a slightly obscured face to someone alive in the courtroom.

For those reasons the Court will allow the testimony as I indicated. I will give the jury a proper limiting instruction at the time. Also, of course, I will give the jury a ["]limited identity of the defendant["] instruction at the time of the final instructions.[18]

(13) The State introduced Drummond's identification testimony at trial. Drummond testified that he recognized Torres in the still images from the Wawa footage and that, based on his familiarity with Torres, he was also able to identify him as a suspect in the other robbery investigations. The trial judge provided a limiting instruction, informing the jury that the testimony was "admitted solely for the purpose of explaining the level of interaction Corporal Drummond had previously had [with Torres], what he may know of Mr. Torres's physical or other personal characteristics, and why he formed and acted on certain duties as he guided the investigation in this matter."[19]

---

[18] App. to Opening Br. at A188–89.
[19] *Id.* at A218.

7

(14) The jury found Torres guilty of all charged offenses except shoplifting. And as mentioned above, the court sentenced Torres to 12 years unsuspended Level V supervision followed by probation.

(15) On appeal, Torres claims that Drummond's testimony was inadmissible under D.R.E. 701. He contends that the testimony interfered with the jury's determination as to identity by allowing Drummond to "gratuitously testify about his prior encounters with Torres and opine that he was the individual in the still shot photo from the Wawa . . . nearly 2 years after the incident."[20] Torres adds that because "the jury and Drummond were equally capable of determining whether the individual in the still photo was Torres[,]" the opinion testimony "merely [told] the jury what result to reach."[21]

(16) We review "a trial court's decision on the admissibility of evidence under an abuse of discretion standard."[22] "An abuse of discretion occurs when a

---

[20] Opening Br. at 9.
[21] *Id.* at 10–11.
[22] *Hines v. State*, 248 A.3d 92, 99 (Del. 2021) (quoting *Rivers v. State*, 183 A.3d 1240, 1243 (Del. 2018)). Torres claims that the scope of our review should be *de novo* because he has alleged a violation of his right to a fair trial under the Due Process clauses of the United States and Delaware Constitutions. Opening Br. at 6; *Greene v. State*, 966 A.2d 824, 827 (Del. 2009) ("[W]e review an evidentiary ruling resulting in an alleged constitutional violation *de novo*."). Torres fails to state how the Superior Court's ruling could rise to the level of a constitutional violation beyond claiming that it "invaded the province of the jury." Opening Br. at 7. Accordingly, we review for abuse of discretion. Torres also claims that this Court must reverse when evidence in the form of "impermissible vouching" is admitted. Opening Br. at 6. "A witness may not bolster or vouch for the credibility of another witness by testifying that the other witness is telling the truth." *Capano v. State*, 781 A.2d 556, 595 (Del. 2001). No such testimony is at issue here. Corporal Drummond did not testify as to the veracity of any other witness.

court has exceeded the bounds of reason in light of the circumstances, or so ignored the recognized rules of law or practice so as to produce injustice."[23]

(17) D.R.E. 701 provides the standard for admission of lay opinion testimony:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a) Rationally based on the witness's perception;
> (b) Helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
> (c) Not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.[24]

(18) In *Thomas v. State* we noted that, "while Rule 701 permits a lay witness to testify about his own impressions when they are based on personal observation[,] [t]he ultimate question of the identity . . . remains one for the jury to decide."[25] "When a jury can readily draw the necessary inferences and conclusions without the aid of the opinion[,]" lay opinion testimony is not helpful to a jury and should not be admitted under Rule 701.[26] In *Thomas*, we expressed "serious reservations" about the admission of lay-opinion identification testimony by law enforcement.[27] This was because "[i]t is unclear . . . how the testimony of a police officer—or any other

---

[23] *Heald v. State*, 251 A.3d 643, 656 (Del. 2021) (quoting *McNair v. State*, 990 A.2d 398, 401 (Del. 2010)).
[24] D.R.E. 701.
[25] *Thomas*, 2019 WL 1380051, at *3 (quoting *Cooke v. State*, 97 A.3d 513, 547 (Del. 2014)).
[26] *Id.*
[27] *Id.*

witness without particular expertise in comparing a videographic representation of a person with a suspect or a defendant—would be helpful to the factfinder in resolving an identification issue."[28]

(19)  With this concern in mind, in *Saavedra v. State* we provided guidance to trial courts considering admission of lay-opinion identification testimony by law enforcement:

> Before a law enforcement witness uses a video clip or photograph to identify the defendant, due caution should be exercised to ensure that a proper foundation is laid establishing, to the trial court's satisfaction, that the witness has a special familiarity with the defendant that would put him in a better position than the jury to make the identification. And in determining whether the witness occupies such a position, the court should also consider whether the images from which the identification is to be made "are not either so unmistakably clear or so hopelessly obscure that the witness is no better suited than the jury to make the identification."[29]

(20)  Most recently, in *Biddle v. State*, we reaffirmed our guidance set forth in *Saavedra*.[30] We also stated that "the fact that Biddle's appearance had changed put the images in the 'buffer zone' between being 'abundantly clear' and 'hopelessly obscure,' such that the officers' testimony would not run afoul of this Court's instructions."[31] We added that "the proper comparison is between the defendant's

---

[28] *Id.*

[29] *Saavedra*, 225 A.3d at 380–81.

[30] *Biddle*, 2023 WL 4876018 at *7.

[31] *Id.*

appearance at the time of the alleged crime versus his appearance at the time of trial."[32]

(21) Torres argues that there was no basis for the trial court to find that Drummond was more likely than the jury to correctly identify Torres because the jury saw both the still images from the Wawa incident and surveillance footage of the 7-Eleven and Shell incidents.[33] This argument is unavailing. In *Biddle*, face-to-face, conversational interactions on eight to ten occasions were sufficient to establish special familiarity.[34] Here, Drummond testified that he had about a dozen interactions with Torres, with at least one lasting "a couple of hours."[35] The trial judge also determined that the still photos linked to Drummond's identification testimony were not "unmistakably clear as to who the identity of that person is. The hat comes down over the top of the head some. We see a good part of the face but not all of it."[36] Further, the trial judge found that Drummond's testimony would be helpful to the jury because Torres had "slimmed down noticeably[,]" and noted that "the proper comparison is between the defendant's appearance at the time of the alleged offense versus his appearance at the time of trial."[37]

---

[32] *Id.* at *8.
[33] Opening Br. at 10.
[34] *Biddle*, 2023 WL 4876018 at *2.
[35] App. to Opening Br. at A162–63.
[36] *Id.* at A186–87.
[37] *Id.* at A187.

11

(22)  Lastly, the trial judge properly instructed the jury that Drummond's testimony was "admitted solely for the purpose of explaining the level of interaction Corporal Drummond had previously had [with Torres], what he may know of Mr. Torres's physical or other personal characteristics, and why he formed and acted on certain duties as he guided the investigation in this matter."[38]  The trial judge also provided the jury with an additional instruction, clarifying "that the ultimate question as to whether or not Mr. Torres has been properly identified remains one for you to determine beyond a reasonable doubt."[39]  We are satisfied that the Superior Court heeded our concerns regarding lay-opinion identification testimony by law enforcement and properly applied our guidance in *Biddle*, *Saavedra*, and *Thomas*.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court be AFFIRMED.

BY THE COURT:

*/s/ Gary F. Traynor*
Justice

---

[38] *Id.* at A219.
[39] *Id.* at A226.