IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JAMIL T. BIDDLE, | § | |
| | § | No. 323, 2022 |
| Defendant Below, Appellant, | § | |
| | § | |
| v. | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| STATE OF DELAWARE, | § | |
| | § | |
| Appellee. | § | I.D. No. 1911015492(N) |

Submitted: May 17, 2023
Decided: July 31, 2023

Before **SEITZ**, Chief Justice; **VALIHURA**, and **TRAYNOR**, Justices.

## **O R D E R**

This 31st day of July 2023, after consideration of the parties' briefs, the record below, and the argument of counsel, it appears to the Court that:

(1)    On November 18, 2021, a Superior Court jury convicted defendant below-appellant Jamil T. Biddle ("Biddle") of Robbery First Degree, Possession of a Firearm During the Commission of a Felony ("PFDCF"), and Conspiracy Second Degree.

(2)    On appeal, Biddle claims that the Superior Court:  (i) abused its discretion and violated Biddle's right to a fair trial when it allowed the State to introduce the lay opinion of three police officers that Biddle was one of the suspects in a surveillance video shown to the jury; (ii) violated his Sixth Amendment right to a fair trial when it discharged a juror without attempting to assess her impartiality; and (iii) abused its discretion by allowing a police officer to testify as to the reason for the absence of any alleged victim or

eyewitness at trial. We conclude that each of Biddle's claims lacks merit. Therefore, we **AFFIRM** the judgment of the Superior Court.

(3) By way of background, on November 22, 2019, at around 9:56 a.m., Wilmington Police Department ("WPD") detective Joran Merced-Falcon was on patrol when a dispatch went out with a "shots fired" incident in the 200 block of North Franklin Street in Wilmington.[1] Shotspotter also indicated that six shots had been fired very close by, at 1216 West Second Street. Although investigating officers found shell casings and one live round in the area, they did not find any potential victims or eyewitnesses to any crimes that may have been committed.

(4) While at the police station that same day, Detective Merced viewed surveillance video of the area captured by a CitiWatch camera that is located on the corner of Second and Franklin Streets (the "CitiWatch Video"). The CitiWatch Video appeared to capture an armed robbery followed shortly thereafter by an exchange of gunfire further down the street. Because Detective Merced was unable to identify anyone in the video himself, he disseminated "attempt-to-identify" flyers to all police officers employed by the WPD. The flyers showed a screen capture of the CitiWatch Video.[2] As a result, police identified two of the suspects: they identified Joseph Coverdale ("Coverdale")[3] as one suspect and Biddle, as the other.

---

[1] App. to Opening Br. at A116 (Merced Trial Test. at 51:12–22), A119 (Merced Trial Test. at 54:8–10). Citations in the form of "[Last Name] Trial Test. at [_]" refer to witness testimony from the trial transcript.

[2] *Id.* at A123 (Merced Trial Test. at 58:11–19).

[3] After a joint-trial, Coverdale was convicted of Robbery First Degree, PFDCF, Carrying a Concealed Deadly Weapon, Conspiracy Second Degree, and Possession of a Firearm by a Person

2

(5) Both Biddle and Coverdale were arrested on November 29, 2019, one week after the incident. Upon his arrest, police officers took a photo of Biddle. On January 6, 2020, a New Castle grand jury indicted Biddle and Coverdale. Biddle was charged with Robbery First Degree, PFDCF, Conspiracy Second Degree, two counts of Attempted Assault First Degree, and related counts of PFDCF and Conspiracy Second Degree.

(6) After denying Biddle's motion *in limine* to exclude police officer testimony identifying him in the CitiWatch Video, the Superior Court, before the jury was selected, held an evidentiary hearing on November 15, 2021 during which the State attempted to lay a foundation for each of the police officers' identification testimony.[4] First, Officer Gaetan MacNamara testified that in his capacity as a patrol officer and investigator, he had interacted with Biddle and the interactions included face-to-face conversations "approximately 25 times."[5] He had seen Biddle in public "approximately 75 times."[6] Second, Cpl. David Schulz testified that in his capacity as a patrol officer and member of the Street Crimes Unit, he had face-to-face, conversational interactions with Biddle "anywhere from eight to ten times."[7] He had viewed Biddle in public or on CitiWatch at least an additional ten times.[8] Finally, Cpl. Leonard Moses testified that in his capacity as

---

Prohibited. At the time of the writing of this Order, Coverdale's appeal was pending before this Court.

[4] *Id.* at A59 (Evidentiary Hearing Tr. at 8:4–5) [hereinafter Evid. Hearing Tr. at [_]].

[5] *Id.* at A61 (MacNamara Evid. Hearing Test. at 13:16). Citations in the form of "Last Name Evid. Hearing Test. at __]" refer to witness testimony from the evidentiary hearing transcript.

[6] *Id.* (MacNamara Evid. Hearing Test. at 15:4).

[7] *Id.* at A69 (Schulz Evid. Hearing Test. at 46:3).

[8] *Id.*

a patrol officer and member of the Street Crimes Unit, he had face-to-face conversational interactions with Biddle "between 20 and 40 times."[9] He observed Biddle around the west side of Wilmington "a lot."[10]

(7)     Following argument and the trial judge's review of the relevant caselaw,[11] the trial judge stated that the court was "at the outset mindful and aware and cautious and takes heed to the Supreme Court's caution regarding its reservations about the admission of identification testimony by police officers without regard to the instructions identified by the court, particularly in *Saavedra*."[12] The court then concluded:

> The court, adhering to the caution set forth in *Saavedra*, is convinced that a proper foundation was laid to my satisfaction that the witnesses had special familiarity with the defendants based under several and numerous and the State's interactions with the defendants. But the [*Saavedra*] court didn't stop there.
>
> The court, again laying out its concern and caution to trial courts stated that after the foundation is laid, the trial court as a gatekeeper also needs to determine whether the witnesses, police officers as a lay witness in this case, would be in a better position than a jury not to make the ultimate decision as to identification, but to be in a position where it would not be cumulative or it would not be superfluous to have them identified because the video or photograph at issue is either hopelessly obscure on one end or unmistakably clear.

---

[9] *Id.* at A74 (Moses Evid. Hearing Test. at 65:5).

[10] *Id.* (Moses Evid. Hearing Test. at 65:18–66:2).

[11] The trial court, the State, Biddle's counsel, and Coverdale's counsel discussed this Court's decisions in *Saavedra v. State*, 225 A.3d 364 (Del. 2020), *Thomas v. State*, 207 A.3d 1124, 2019 WL 1380051 (Del. 2019) (TABLE), *Weber v. State*, 547 A.2d 948 (1988), and the New Jersey Supreme Court's decision in *State v. Lazo*, 34 A.3d 1233 (N.J. 2012), in depth.

[12] App. to Opening Br. at A85 (Evid. Hearing Tr. at 111:4–9). The court also noted that the officers' interactions with the defendants included "pedestrian stops, traffic stops, and other physical interactions." *Id.* (Evid. Hearing Tr. at 112:7–8).

I think defense counsel has leaned towards the photograph and video being unmistakably clear such that the police officers need not testify and should allow the jury to simply look at the video and the photographs and look at the defendants' in-court personas and make an identification or lack of identification based on that.

The court finds with respect to Mr. Biddle . . . based on the testimony and what I've seen from the video as well as the testimony of the officers, his appearance in court today is not the same as it was at the time of the alleged incident. . . .

Each of the witnesses or proposed witnesses indicated that the defendant at the time didn't wear -- at the time they knew him and at the time of the incident didn't wear glasses and his hair style was not the lengthy braids that he has now.  Based on that, the court finds that that [sic] adhering to the Supreme Court's instruction, the court finds that that's within the buffer zone of hopelessly obscure or abundantly clear such that the testimony by the officers would not run afoul of the Supreme Court's instructions.[13]

(8)    Further, the trial judge acknowledged Biddle's argument that the correct "measuring stick" was not what Biddle looked like at the time of trial versus what he looked like at the time of the incident (*i.e.*, in the CitiWatch Video), but rather, was what Biddle looked like at the time of his arrest photograph versus what he looked like at the time of the incident.[14]  However, the trial court clarified that, after its review of Biddle's cited cases, the correct comparison was trial versus the incident.[15]  He then stated that, "out of the cautions set forth by the Supreme Court with respect to this type of testimony," he would include an appropriate instruction with respect to identification.[16]

---

[13] *Id.* at A85–86 (Evid. Hearing Tr. at 112:16–114:22).

[14] *Id.* at A86 (Evid. Hearing Tr. at 113:23).

[15] *Id.* (Evid. Hearing Tr. at 113–14).

[16] *Id.* (Evid. Hearing Tr. at 115:14–18).

(9) Accordingly, at trial, the State introduced testimony from four police officers as to the identification of Biddle in the CitiWatch Video.[17] The first officer to testify was Detective Merced. As chief investigating officer, Detective Merced testified as to how the investigation proceeded, including how he had disseminated the still shot of Biddle from the CitiWatch Video to the WPD for identification purposes. Detective Merced also testified that in his experience handling well over 100 cases, victims in the city of Wilmington are generally uncooperative,[18] as are witnesses.[19]

(10) The second, third, and forth police officers then testified.[20] Each identified Biddle in court,[21] and in the CitiWatch Video.[22] Each testified that Biddle's appearance in court was different than his appearance in the CitiWatch Video, specifically that Biddle

---

[17] The State also presented testimony regarding the shell casings police officers found at the scene of the crime. Because Biddle was acquitted of crimes related to the shooting incident, this evidence is not relevant on appeal.

[18] *Id.* at A125 (Merced Trial Test. at 64:7–10).

[19] App. to Answering Br. at B5–6 (Merced Trial Test. at 68:20–69:1).

[20] Before the second police officer was sworn in, the trial court instructed the jury:

> You'll be hearing from police officers, and there may be some notation that the police officer had some level of interaction with the defendants. You are not to infer what that interaction was or what was involved in any of those conversations, just that there was some level of interaction. Okay? So kind of giving you that precursor in framing the testimony that's anticipated.

Trial Tr. at 100:2–8, Nov. 16, 2021. *See State v. Norris*, 2021 WL 4239665, at *2 (Del. Super. Sept. 16, 2021) ("The prejudice [of the fact that the witness is a police officer] may be remediated by careful questioning of the police officer and an appropriate limiting instruction to the jury.") (footnotes omitted) (allowing police officer witness to provide lay witness testimony identifying defendant in surveillance video).

[21] App. to Opening Br. at A137–38 (Schulz Trial Test. at 103:20–104:2); *Id.* at A148 (Moses Trial Test. at 129:19–22); App. to Answering Br. at B14 (MacNamara Trial Test. at 154:6–8).

[22] App. to Opening Br. at A140 (Schulz Trial Test. at 114:17–21); *Id.* at A153 (Moses Trial Test. at 134:12–16); App. to Answering Br. at B14 (MacNamara Trial Test. at 154:1–5).

had changed to a braided hairstyle. In addition, he had acquired glasses, removed his facial hair, and had lost weight.[23]

(11)　After both the State and Coverdale had rested their cases, and after Biddle had presented his alibi defense, but before Biddle rested his case, the trial court informed counsel during a sidebar that Juror No. 1 believed that she recognized the previous witness.[24] Juror No. 1 then clarified that, with respect to the man in the screenshot of the CitiWatch Video wearing the white sweatshirt and denim jacket (identified by the testifying officers as Biddle), there was "someone that looks like him that I might know."[25] Specifically, Juror No. 1 stated that he was incarcerated and looked like someone that she may be working with at her job, to get him into community services following his incarceration.[26] The trial judge then engaged in the following colloquy with Juror No. 1:

> JUROR NO. 1:  [] I think the picture is someone I recognized.
>
> THE COURT:  Can you bring all the pictures and we will see?
>
> THE STATE:  Sure.
>
> THE COURT:  You just realized that?
>
> JUROR NO. 1:  Yeah. I was trying to figure it out. And the name popped up on my screen this morning when I was working. And that's what I was thinking of.

---

[23] App. to Opening Br. at A139 (Schulz Trial Test. at 113:2–10); *Id.* at A153 (Moses Trial Test. at 134:4–9); App. to Answering Br. at B14 (MacNamara Trial Test. at 154:9–15). Biddle presented an alibi defense and denied that he was the individual in the CitiWatch Video. In support of this defense, Biddle's fiancée, Adejah Carter, testified, in part, that Biddle was not the individual in the denim jacket in the CitiWatch Video. App. to Answering Br. at B35–36 (Carter Trial Test. at 117–18).

[24] App. to Answering Br. at B52 (Trial Tr.at 134).

[25] *Id.* (Trial Tr. at 134:15–16).

[26] *Id.* (Trial Tr. at 134:9–16).

7

THE COURT: This picture?

JUROR NO. 1: This one looks like Shukri Thomas.

THE COURT: Okay. But that name hasn't been used in this trial at all, right?

JUROR NO. 1: No.

THE COURT: You are saying this individual looks like someone you know to be Shukri Thomas.

JUROR NO. 1: Yeah.[27]

(12)     Thereafter, the trial judge dismissed Juror No. 1 from the sidebar so that the court could discuss the matter with counsel. The State and Coverdale's counsel agreed with the trial judge that Juror No. 1 had to be excused because there was no way to tell her that the individual in the photograph was not the person from her job.[28] Specifically, the parties stated:

THE STATE: It's clearly an issue, Your Honor. I wish she never told us that. I think she needs to be excused and an alternate should go in her place.

THE COURT: Any opposition to that?

COVERDALE'S COUNSEL: No.

THE COURT: In all fairness.

BIDDLE'S COUNSEL: I disagree. I think she should stay on the jury, absolutely.

COVERDALE'S COUNSEL: I mean, how would you answer that question? She has a question she might recognize somebody that may or may not be a part of this. He can't answer that question. Your Honor, I mean, don't know how you answer that question.

---

[27] *Id.* at B53 (Trial Tr. at 135:3–22).

[28] *Id.* at B54–55 (Trial Tr. at 136–37).

8

THE COURT:  So your position is what?

COVERDALE'S COUNSEL:  She has to be excused.  You can't tell her it's not the one she thinks it is because of the identity issue.

THE COURT:  Exactly, right.

COVERDALE'S COUNSEL:  I don't mean to undercut [Biddle's counsel].  If he has another argument, I will defer to him.  This is bizarre.

BIDDLE'S COUNSEL:  The State is trying to prove that that guy is my client.

THE COURT:  Well, if she kept that in her head, that's one thing.  But she disclosed that.

COVERDALE'S COUNSEL:  Right.  That's unfortunate.  That's really unfortunate.

BIDDLE'S COUNSEL:  Well, I've asked the case to be dismissed and the prosecutor investigate the other guy that she identified.

THE COURT:  Are you serious?

BIDDLE'S COUNSEL:  No. I mean, I just feel like --

THE COURT:  Give me rules or arguments.  Because right now I don't want feelings and --

BIDDLE'S COUNSEL:  I understand what you are saying.  I'm just trying to think of what the best argument is.  If she can be fair and impartial in deciding who that person is, I still think perhaps she can say that. I don't know.  We should ask her if she thinks that the State is alleging it's somebody else, if she thinks she can be fair and impartial about who it is based on the answer.  But I think she needs to be asked that.

THE COURT:  I disagree.  Again, if she looked at this individual and she's processing this and said to herself and then when she's in deliberations that this guy looks like whoever she just said he was, but she brought that to our attention.  At this point, I think she has to be excused.  For the record, I have your argument.  And it's preserved for the record if you need to appeal.  But I think she needs to be

9

excused. And we'll move Alternate 1 into that position. I just want to ask her one question, though.[29]

(13) The trial judge then recalled Juror No. 1 to the conversation and confirmed with her that she had not shared her belief that the man in the photograph was someone that she knew with any other member of the jury.[30] The following exchange occurred:

> THE COURT: Ma'am, I just want to ask: I've given you instructions throughout this trial not to discuss this case with any other jurors. Did you communicate to any other juror the fact you said this happened this morning?
>
> JUROR NO. 1: Yeah, at home when I was working, and I checked the name and the services. And that's why that picture looked familiar to me. I didn't discuss it with anyone.
>
> THE COURT: Thank you. I'm going to excuse you as a juror. And I appreciate your candor in letting us know that. Don't discuss it with anyone. I'm going to excuse you.[31]

(14) Immediately afterwards, Biddle orally moved for a mistrial, twice. The trial judge denied both of Biddle's motions.[32] In his first motion, Biddle argued, "how could we ignore the fact that a witness who knows somebody very well, knows what he looks

---

[29] *Id.* at B54–56 (Trail Tr. at 136:6–138:20).

[30] After the trial court dismissed Juror No. 1, the trial court addressed the issue with the jury. The court stated:

> I just want [sic] make certain that you've continued to follow my admonition not to discuss this case, do any independent research or any such thing until you've actually been together to deliberate. Is that fair? And you have not discussed this case with any third parties and no third parties have contacted you about this case, correct?

Trial Tr. at 8:16–9:1, Nov. 18, 2021.

[31] App. to Answering Br. at B57 (Trial Tr. at 139:3–16).

[32] *Id.* at B58 (Trial Tr. at 140:18), B62 (Trial Tr. at 144:6). Biddle moved for a mistrial twice within one sidebar conversation with the trial judge. After the trial judge denied the initial motion, Biddle's counsel continued to argue that the juror issue warranted a mistrial, and he renewed his motion for a mistrial.

like, and then we just ignore that? I just think it's a problem and I'm asking for a mistrial."[33]

The trial court denied the first motion, stating "she didn't say definitively that that's the person."[34] Biddle renewed his motion. In rejecting Biddle's second motion for a mistrial, the trial judge explained, in reference to the individual in the denim jacket in the CitiWatch Video:

> [Juror No. 1 is excused because] [i]t could be a lot of people. It could be your client. But that's what [the members of the jury] get to decide. Had she kept that in her head -- there could be five other people in that jury box that says that guys looks [sic] like my neighbor. I don't believe its him. It looks like my neighbor. But the fact that she came forward shows that -- she's demonstrating that she has a conflict. And like [Coverdale's counsel] rightfully pointed out, what do you ask her, to just disregard it?[35]

The trial judge also emphasized that the main reason he was denying the motions for a mistrial was because Juror. No 1 did not say that the man in the video was her client. Rather, she stated he *looked like* a client of hers.[36]

(15) Following trial but prior to sentencing, Biddle filed a Motion for a New Trial.[37] As he does on appeal, Biddle argued that the trial court's dismissal of Juror No. 1 was improper, and, accordingly, a new trial was required. Specifically, he argued "that Juror #1 would have 'clearly supported the acquittal of Mr. Biddle' and this fact 'did not

---

[33] *Id.* (Trial Tr. at 140:7–11).

[34] *Id.* (Trial Tr. at 140:12–13).

[35] *Id.* at B60–61 (Trial Tr. at 142:16–143:3).

[36] *Id.* at B65 (Trial Tr. at 147:3–5).

[37] App. to Opening Br. at A263–66 (Motion for New Trial, dated Nov. 24, 2021).

require her dismissal from the jury.'"[38]  Further, Biddle contended "that Juror #1 should have been asked if she could fairly and impartially decide the case.  Instead, she was dismissed."[39]  The trial court denied Biddle's motion.  It ruled:

> Juror conduct that is presumptively prejudicial includes when jurors are made aware of information, not introduced at trial, that relates to the facts of the case or the character of the defendant.  It is the trial judge who is best situated to determine competency for jurors to serve impartially.  When Juror #1 came forward with information, it was clear she was no longer impartial to the facts of the case. The Court excused Juror #1 to preserve Defendant's right to a fair and impartial jury.[40]

(16)    On August 12, 2022, the Superior Court sentenced Biddle to an aggregate of ten years incarceration followed by decreasing levels of supervision.[41]

(17)    Biddle challenges each of the foregoing decisions made by the trial judge: the decision to admit the testimony of three police officers as to Biddle's identity in the CitiWatch Video; the decision to discharge Juror No. 1 after she communicated to the trial court the man in the CitiWatch Video resembled someone she knew; and the decision to admit Detective Merced's testimony that, in his experience, victims and eyewitnesses in Wilmington are generally uncooperative.  As discussed below, we find no error in any of the Superior Court's challenged rulings.

(18)    Biddle first argues that the officer testimony identifying him in the video is inadmissible under Delaware Rule of Evidence ("D.R.E.") 701, and that even if the

---

[38] *State v. Biddle*, 2022 WL 102376, at \*1 (Del. Super. Jan. 10, 2022) (quoting Motion for New Trial ¶ 5).

[39] *Id.*

[40] *Id*. (internal footnotes omitted).

[41] Exhibit A to Opening Br. (Sentencing Order).

testimony were admissible, at a minimum, the testimony of the third officer amounted to improper vouching. This Court reviews "a trial court's decision on the admissibility of evidence under an abuse of discretion standard."[42] However, Biddle further alleges that the erroneous admission of the three officers' lay opinions invaded the province of the jury and led to a violation of Biddle's right to a fair trial under the Due Process Clause of the Delaware and United States Constitutions. We review "an evidentiary ruling resulting in an alleged constitutional violation *de novo*."[43]

(19)    Under D.R.E. 701,

[i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
(a) Rationally based on the witness's perception;
(b) Helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
(c) Not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.[44]

This Court recently reviewed a trial court's admission of police officer video identification testimony in *Thomas v. State*.[45] In *Thomas*, a police detective testified that the defendant, Thomas, was the person depicted in a surveillance video. The State highlighted the video as evidence that Thomas retrieved a gun shortly before the murder of which he was

---

[42] *Hines v. State*, 248 A.3d 92, 99 (Del. 2021) (quoting *Rivers v. State*, 183 A.3d 1240, 1243 (Del. 2018)).

[43] *Greene v. State*, 966 A.2d 824, 827 (Del. 2009) (citing *Flonnory v. State*, 893 A.2d 507, 515 (Del. 2006)).

[44] D.R.E. 701.

[45] 2019 WL 1380051, at *2.

convicted following the trial.[46]  On appeal to this Court, Thomas argued that the officer testimony was inadmissible under D.R.E. 701.  We explained that:

> Rule 701 "permits a lay witness to testify about his own impressions when they are based on personal observation."  "The ultimate question of the identity . . . remains one for the jury to decide, and lay opinion testimony will not be helpful to the jury 'when the jury can readily draw the necessary inferences and conclusions without the aid of the opinion.'"[47]

We stopped short of finding the admission of the officer's testimony to be an abuse of discretion, and we expressed our "serious reservations about the admission of this type of identification testimony."[48]  Specifically, we stated that "[i]t is unclear to us how the testimony of a police officer—or any other witness without particular expertise in comparing a videographic representation of a person with a suspect or defendant—would be helpful to the factfinder in resolving an identification issue."[49]  We held that "even if

---

[46] *Id.*

[47] *Id.* at \*3 (citing *Cooke v. State*, 97 A.3d 513, 547 (Del. 2014)).  In *Cooke*, this Court ruled that the trial court did not abuse its discretion when it admitted lay opinion testimony of a police officer identifying the defendant's voice on phone call recordings.  The defendant argued that the officer was "no better suited than the jury to make the judgment at issue" because the jury had listened to the recordings, watched a video of the defendant's post-arrest interview, and heard the defendant speak in court.  *Cooke*, 97 A.3d at 547.  This Court ruled that:

> [b]ecause there was a basis in the record for the Superior Court to find that [the officer] was more familiar with Cooke's voice than the jury because of, among other things, his extensive face-to-face interview with Cooke, and thus, that his testimony would be helpful, the Superior Court did not abuse its discretion in admitting the testimony.

*Cooke*, 97 A.3d at 547.

[48] *Thomas*, 2019 WL 1380051, at \*3.  Among other things, we noted that "it was the defense that initially elicited testimony touching upon the investigating officers' ability to identify individuals depicted in the different videos."  *Id.*

[49] *Id.*

14

the detective's opinion should not have come in, the admission of his testimony was harmless and therefore does not warrant reversal."[50]

(20)   In *Saavedra v. State*, we reiterated our "concerns about the use of lay opinion testimony by police officers to identify defendants from photographic or videographic images."[51]  There, we urged our trial courts and Bar to be mindful of these concerns and we advised that:

> Before a law enforcement witness uses a video clip or photograph to identify the defendant, due caution should be exercised to ensure that a proper foundation is laid establishing, to the trial court's satisfaction, *that the witness has a special familiarity with the defendant that would put him in a better position than the jury to make the identification.*  And in determining whether the witness occupies such a position, the court should also consider *whether the images from which the identification is to be made 'are not either so unmistakably clear or so hopelessly obscure that the witness is no better suited than the jury to make the identification.'"[52]

(21)   Heeding our concerns expressed in *Thomas* and following our guidance set forth in *Saavedra*, the trial court made the required findings during the evidentiary hearing. First, the trial court heard testimony from each officer and determined that a proper foundation had been laid as to each officer's "special familiarity" with Biddle at the time.[53]

(22)   Next, the trial judge considered that Biddle's appearance had changed from the incident to the time of trial such that police officer testimony would be helpful to the

---

[50] *Id.* at *4.

[51] 225 A.3d at 380.

[52] *Id.* at 380–81 (first citing *United States v. Jett*, 908 F.3d 252, 271–72 (7th Cir. 2018) and *Lazo*, 34 A.3d at 1241–42; then citing *United States v. Jackman*, 48 F.3d 1, 4–5 (1st Cir. 1995)) (emphasis added).

[53] App. to Opening Br. at A85 (Trial Tr. at 112:18–19).

15

jury. As the trial judge put it, the fact that Biddle's appearance had changed put the images in the "buffer zone" between being "abundantly clear" and "hopelessly obscure," such that the officers' testimony would not run afoul of this Court's instructions.[54]

(23) Biddle argues that the police officer testimony was unhelpful because the jury was able to view Biddle's arrest photo, in which his appearance was unchanged since the incident. This argument is unavailing. For one, even when directly comparing the arrest photo to the CitiWatch Video, the video is not "unmistakably clear." Moreover, even if it were, Biddle's changed appearance at trial would still render the officers' testimony helpful to a jury's determination of the identity of the perpetrator. Finally, we agree with the trial judge that the proper comparison is between the defendant's appearance at the time of the alleged crime versus his appearance at the time of trial.[55]

(24) Accordingly, we find that the trial court faithfully applied the factors that we set forth in *Saavedra* and did not err in admitting the evidence. Further, the trial court took care "out of cautions set forth by the Supreme Court with respect to this type of testimony [to] include . . . an appropriate identification instruction for the jury."[56]

---

[54] *Id.* at A86 (Trial Tr. at 114:20–22).

[55] *See, e.g.*, *Saavedra*, 225 A.3d at 380–81, 380–81 n.78 ("[W]hen there is no change in a defendant's appearance, juries can decide for themselves—without identification testimony from law enforcement—whether the person in the photograph is the defendant sitting before them." (citing *Lazo*, 34 A.3d at 1241–42)). As the State put it, the jury was tasked with determining whether the defendant in the courtroom was the person in the video committing the crimes, and that the defendant in the courtroom was on trial, not the arrest photograph.

[56] App. to Opening Br. at A86 (Trial Tr. at 115:14–17). The trial court gave the following instruction to the jury:

> Identification of defendants. An issue in this case is the identification of the defendants. To find the defendants guilty, you must be satisfied beyond a reasonable doubt that the defendants have been accurately identified[,] that the

(25)     In the alternative, Biddle argues that even if the officers' testimony had been properly admitted under D.R.E. 701, the testimony of the third officer — Officer MacNamara — amounted to improper vouching.  "As a general rule, a witness may not bolster or vouch for the credibility of another witness by testifying that the other witness is telling the truth."[57]  "[I]mproper vouching includes testimony that *directly or indirectly* provides an opinion on the veracity of a particular witness."[58]  Officer MacNamara's testimony did not reference the testimony of the first two officers or their credibility as witnesses.[59]  Rather, Officer MacNamara testified as to his own familiarity with Biddle, based on his approximately 25 face-to-face interactions with him at that time,[60] and his own belief that Biddle was the man in the CitiWatch Video.  Accordingly, we reject Biddle's argument.

(26)     Biddle's second contention on appeal is that the Superior Court erred as a matter of law and abused its discretion in discharging Juror No. 1, and in doing so, violated

---

wrongful conduct charge in this case actually took place and that the defendants were in fact the persons who committed the act. If there is any reasonable doubt about the identification of the defendants, you must give the defendants the benefit of such doubt and find the defendants not guilty.

Trial Tr. at 268:22–269:10, Nov. 17, 2021.

[57] *Capano v. State,* 781 A.2d 556, 595 (Del. 2001); *accord Luttrell v. State*, 97 A.3d 70, 78 (Del. 2014).

[58] *Capano*, 781 A.2d at 595 (citing *Wheat v. State*, 527 A.2d 269, 275 (Del. 1987)) (emphasis in original); *accord Luttrell*, 97 A.3d at 78.

[59] *See Thomas*, 2019 WL 1380051, at *4 (finding no improper vouching where officer identification testimony "was explicitly linked to evidence that the jury viewed during the trial— the video clips" and officer "did not offer any opinions on the credibility of other prosecution witnesses").

[60] App. to Opening Br. at A61 (MacNamara Evid. Hearing Test. at 13:16).

his Sixth Amendment right to a unanimous verdict and fair trial. His argument is two-fold. First, Biddle argues that the trial judge erred as a matter of law when he excused Juror No.1, over Biddle's objections at trial, without first conducting "a sufficient inquiry into juror bias," as required by *Schwan v. State*.[61] Second, Biddle argues that the trial court's conclusion that Juror No. 1's conduct was "presumptively prejudicial" is not supported by the record.[62]

(27) In *Schwan v. State*, this Court held "that the trial judge erred by failing to exclude [a] juror, in the absence of a determination that the juror could render a fair and impartial verdict."[63] Although we recognized that, "[a] trial judge's decision *not to* remove a juror for cause is ordinarily entitled to deference . . . when the trial judge fails to conduct a sufficient inquiry into juror bias, we are required to independently evaluate the fairness and impartiality of the juror."[64] This review is "more analogous to *de novo* review."[65] Following a *de novo* review of the record in *Schwan*, we held "that the trial judge committed reversible error by not excluding, for cause, a juror who was acquainted with a prosecutor, although that same prosecutor was not involved in Schwan's case."[66]

(28) Because the juror in *Schwan* was never asked whether she could render a fair and impartial verdict, notwithstanding her ongoing business relationship with the non-trial

---

[61] Opening Br. at 17, 23 (citing *Schwan v. State*, 65 A.3d 582, 590 (Del. 2013)).

[62] Opening Br. at 24, 25.

[63] *Schwan*, 65 A.3d at 585.

[64] *Id.* at 590 (emphasis added).

[65] *Id.* (quoting *Knox v. State*, 29 A.3d 217, 221 (Del. 2011)).

[66] *Id.* at 585.

prosecutor, we found the trial judge's examination to be incomplete. We specifically noted that there was "no opportunity to assess [the juror's] credibility" on the issue of her impartiality.[67] Accordingly, we found that there was "no record to support a determination on appeal that Juror 11 had the capacity to render a fair and impartial verdict in Schwan's case."[68] We adhere to our ruling in *Schwan* where we determined that the trial judge denied the application to remove a juror based upon an incomplete record. Here, by contrast, based upon the judge's colloquy with Juror No. 1, there was a sufficient basis on the record for the judge to conclude that Juror No. 1 had engaged in conduct that was presumptively prejudicial and that she "was no longer impartial to the facts of the case."[69]

(29) Biddle takes issue with the trial court's explanation, given in its ruling denying Biddle's Motion for a New Trial,[70] that Juror No. 1's conduct was presumptively prejudicial. He argues that there is nothing in the record to support this conclusion. "[T]he right to a fair trial by an impartial jury in a criminal proceeding, that is guaranteed by both the United States Constitution and the Delaware Constitution requires that 'the jury's

---

[67] *Id.* at 590.

[68] *Id.* at 592.

[69] *Biddle*, 2022 WL 102376, at *1. Moreover, Biddle was tried jointly with his co-defendant, Coverdale. Because Coverdale's counsel immediately agreed that "[s]he has to be excused," the trial court's failure to dismiss her would have, potentially, prejudiced Mr. Coverdale and deprived him of his right to a fair trial. App. to Answering Br. at B54 (Trial Tr. at 136:22).

[70] Biddle takes issue with the fact that the trial judge only gave this explanation in ruling on his Motion for New Trial, and not at trial, when he excused the juror. Opening Br. at 23–24. Ideally, the trial judge would have done so, as the record of the colloquy during trial supports, and is entirely consistent with, the later ruling.

verdict be based on evidence received in open court, not from outside sources.'"[71] "Conduct that is presumptively prejudicial includes . . . when jurors are made aware of information, not introduced at trial, that relates to the facts of the case or the character of the defendant."[72] In this case, Juror No. 1 disclosed to the court that she thought that the individual in the denim jacket in the CitiWatch Video resembled someone else she knew, who was incarcerated. In response to the trial court's inquiry, Juror No. 1 explained "at home when I was working . . . I checked the name and the services. And that's why that picture looked familiar to me."[73] Thereafter, the trial judge excused Juror No. 1.[74] Juror No. 1's independent investigation into the name of the person she believed resembled the person in the video screenshot constitutes conduct that is presumptively prejudicial because she based her concern about the identity of one of the perpetrators, at least in part, on information from an outside source. In other words, she expressed doubt as to the identification of Biddle based on her independent investigation into the identity of the man in the CitiWatch Video screenshot photograph. Because the key issue in Biddle's case was identity, the potential for prejudice due to Juror No. 1's belief was significant.

---

[71] *Flonnory v. State*, 778 A.2d 1044, 1052–53 (Del. 2001) (quoting *Marshall v. United States*, 360 U.S. 310, 312–13, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959) (per curiam) and *Hughes v. State*, 490 A.2d 1034 (1985)).

[72] *State v. Redden*, 2010 WL 893685, at *1 (Del. Super. Jan. 12, 2010) (citing *Miller v. State*, 884 A.2d 512, 2005 WL 16653713, at *2 (Del. July 12, 2005) (TABLE)), *aff'd*, 998 A.2d 851, 2010 WL 2560041, at *2 (Del. June 25, 2010) (TABLE).

[73] App. to Answering Br. at B57 (Trial Tr. at 139:8–11).

[74] Biddle's argument that the trial judge's decision to excuse Juror No. 1 was not based on her disclosure that she independently investigated whether the man in the picture was another man she knew through work is undercut by the fact that the trial judge only definitively excused Juror No. 1 *after* this disclosure. *Id.* (Trial Tr. at 139:8–14).

20

(30)     Finally, Biddle challenges the admission of Detective Merced's testimony that victims and witnesses in Wilmington are generally uncooperative with police investigations under D.R.E. 401 and 403.  We review the trial court's admission of this testimony for an abuse of discretion.[75]  Under D.R.E. 401, evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence."[76]  This Court has stated that "[t]he definition of relevance encompasses materiality and probative value."[77]  "Materiality looks to the relation between the propositions for which the evidence is offered and the issues, or ultimate facts, in the case."[78]  "Probative value is concerned with the tendency of the evidence to establish the proposition that it is offered to prove."[79]

(31)     In this case, during his opening statement, Biddle opened the door to Detective Merced's testimony when his counsel stated that the State would not be offering victim or eyewitness testimony.  Specifically, Biddle's counsel stated that:

> The evidence in this case will be the testimony from the witnesses who take the witness stand and any evidence that is submitted when they are on the witness stand.  There is a video that shows something occurred.  *We'll find out if someone shows up to say what actually occurred*.[80]

---

[75] *Hines*, 248 A.3d at 99.

[76] D.R.E. 401.

[77] *Lilly v. State,* 649 A.2d 1055, 1060 (Del. 1994) (citing *Getz v. State*, 538 A.2d 726, 731 (Del. 1988)).

[78] *Getz*, 538 A.2d at 731.

[79] *Id.*

[80] App. to Opening Br. at A103 (Trial Tr. at 38:14–19) (emphasis added).

21

After Biddle's counsel made the foregoing statement during his opening statement, the State called Detective Merced to the stand as its first witness. In allowing the State to elicit testimony regarding victim and eyewitnesses in Wilmington, the trial judge limited the prosecutor to a single question as to victims, and a single question as to witnesses, and prohibited any follow up.[81] Accordingly, the State only elicited the following statements:

> THE STATE: Okay. In your experience investigating over 100 cases, are victims in the city of Wilmington generally cooperative or uncooperative?
>
> DET. MERCED: Uncooperative.[82]
>
> . . .
>
> THE STATE: Detective Merced, in your experience with your hundreds of cases you've been assigned at the Wilmington Police Department, are witnesses of crimes in the city generally cooperative or uncooperative?
>
> DET. MERCED: Uncooperative.[83]

(32)     Biddle's counsel's opening statement opened the door to the reason for the lack of victim and eyewitness testimony. The State's questioning of Detective Merced elicited an alternative explanation as to why there were no other witnesses.[84]

---

[81] App. to Answering Br. at B5 (Merced Trial Test. at 68:14–15).

[82] App. to Opening Br. at A125 (Merced Trial Test. at 64:7–10).

[83] App. to Answering Br. at B5–6 (Merced Trial Test. at 68:20–69:1).

[84] One of Biddle's arguments is that "[t]here was no evidence in the record as to the reason the State had no victim or witnesses appear at trial in this case[,]" Opening Br. at 28, and thus, the State's argument was one "based on facts not in evidence." Opening Br. at 30. At oral argument, the State expressed its legitimate concern that addressing Biddle's argument with specific evidence may be more prejudicial to the defendant than the generalized statements made by Detective Merced. The State argued:

> The Court: [Defense Counsel]'s argument is that you need to make it more specific to this case . . .

(33)   Biddle next argues that even if Detective Merced's testimony was proper under D.R.E. 401, it should have been barred pursuant to D.R.E. 403.  D.R.E. 403 allows a trial court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[85]  Unfair prejudice is defined as "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."[86]

(34)   Specifically, Biddle claims that the testimony was improper because it "allowed the State to argue that the absence of witnesses was due only to general uncooperation" which amounted to "an argument based on facts not in evidence."[87]  During rebuttal, the State stated:

> Because of a video, you don't need witnesses to come in and say, hey, I saw this.  You heard from Detective Merced.  Witnesses and victims in the City

---

The State: There are a lot of warnings about making it specific to each case. I think when we keep it general and we keep it . . . and a few questions, you have less of a . . . less of a possibility of prejudice to the defendant. If you start getting into specifics about it, it can be, can very much lean toward, it looks like this person isn't here because the defendant doesn't want them to be here.  So, I think that's a dangerous line to tread when we're talking about specifics. I think that the evidence has to be pretty clear, and we get instructions about that, it's a much more in-depth analysis. And I think that keeping it at a couple of questions that are very general, that are not specific to the defendant because you don't want to run the risk of the prejudice, is fair. And it is especially fair in a case where the defendant himself has raised that issue.

Oral Argument at 29:44–30:43, *Biddle v. State*, No. 323, 2022, *available at* https://livestream.com/accounts/5969852/events/10842481/videos/236239224.

[85] D.R.E. 403.

[86] *Paikin v. Vigilant Ins. Co.*, 2013 WL 5488454, at *3 n.7 (Del. Super. Oct. 1, 2013) (quoting Advisory Committee's Note, Fed. R. Evid. 403).

[87] Opening Br. at 30.

23

of Wilmington are generally uncooperative. They don't want to talk to the police about what they observed. So we don't have that today. But what you do have is a video that depicts everything that happened.[88]

The State's statements regarding Detective Merced's testimony during rebuttal asked the jury to focus on the other evidence — the CitiWatch Video — and provided context as to why no other witnesses were present at trial to testify.

(35) Moreover, the State only elaborated on Detective Merced's testimony *after* Biddle heavily emphasized the fact of a lack of victim and eyewitness testimony during his closing statement. In his closing statement, Biddle stated:

> There is no -- *the victim didn't come in here and testify*. We don't know what the victim said. And if you watch the video enough times you will see, like we all did, there is [sic] like ten people standing around. Whether the police could have identified someone, asked somebody what happened there. *There is literally, if this is a robbery, as the State contends, it's like the low key robbery because it seems like everybody is just standing around and life is normal.*
>
> *But those are decisions you have to make.* But the bottom line is, there is no testimony from the alleged victim. And I call them alleged because we don't know what happened there. Earlier in the video at the very beginning he's up walking up the street with these guys. So we don't really know. *But the bottom line is, there is no victim testimony in this case*. There is [sic] multiple witnesses who were standing around in that video. *There is no witness testimony in this case.* You can watch the video and determine for yourself if people seem to know each other or not. *But nobody who was on the street, all, whatever number of people, came in here to testify*. The reaction is sort of like what really happened. I don't know. You can watch the video. But I did need to make some general comment on this.[89]

---

[88] App. to Opening Br. at A256 (Trial Tr. at 239:11–19).

[89] *Id.* at A249–51 (Trial Tr. at 218:22–220:5) (emphasis added).

Thus, Detective Merced's observations offering an alternative explanation of an issue that Biddle raised, and the State's comments in its rebuttal, were not *unfairly* prejudicial.[90]

NOW, THEREFORE, IT IS HEREBY ORDERED that the judgment of the Superior Court be, and the same hereby is, AFFIRMED.

BY THE COURT:

*/s/ Karen L. Valihura*
Justice

---

[90] *State v. Sullins*, 2007 WL 2083657, at *6 n.26 (Del. Super. July 18, 2007) ("Virtually all evidence is prejudicial-if the truth be told, that is almost always why the proponent seeks to introduce it-but it is only *unfair* prejudice against which the law protects.") (quoting *United States v. Pitrone*, 115 F.3d 1, 8 (1st Cir. 1997))), *aff'd*, 945 A.2d 1168, 2008 WL 880166, at *2 (Del. Apr. 2, 2008) (TABLE).